IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ASSAM R. ALI              :
                          :
   v.                     :    Civil Action No. DKC 09-1628
                          :
ENERGY ENTERPRISE SOLUTIONS, :
LLC                       :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination and retaliation case is Defendant's motion for summary judgment (Paper 15). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion for summary judgment will be granted.

**I. Background**

The following facts are either uncontroverted or construed in the light most favorable to Plaintiff, the non-moving party. Plaintiff Assam R. Ali was hired by Defendant Energy Enterprise Solutions, LLC ("EES") on April 1, 2006. (Paper 1 ¶ 9; Paper 15, at 2). EES provides information technology ("IT") support services to customers, including the federal government. (Paper 15, at 2). Specifically, EES works with the United States Department of Energy ("DOE") in partnership with several other companies to deliver IT products and services. (*Id*.).

Plaintiff was an at-will employee at all times during his tenure at EES. When initially hired, Plaintiff worked as a Customer Support Technician. (Paper 1, ¶ 9; Paper 15, at 2). Defendant maintains Plaintiff's initial salary was $50,000 per year and Plaintiff maintains it was $57,000.

On June 1, 2007, Plaintiff was assigned to work as part of a network team. (Paper 1, ¶ 11; Paper 15, at 3). The network teams are "responsible for keeping the entire network system in working order, thus allowing thousands of DOE end users the ability to communicate and perform their duties." (Paper 15, at 2). Effective June 1, Plaintiff's salary was increased to $65,000. (Paper 1 ¶ 11; Paper 15, at 3). After several months of on-the-job training, Plaintiff received individual privileges to work on the network. (*Id.*). Data network team members are required to advise other team members when they will be making any changes to the network system so that everyone is prepared in case of a problem. Network outages occasionally occur and disrupt work at the federal offices. Therefore, only members of the data network team have access privileges to work on the network. (Paper 15, at 3).

Defendant alleges that prior to April 25, 2008 Plaintiff's access privileges were suspended on "several" occasions due to performance issues and human errors. In his deposition, Plaintiff seems to agree that his privileges were taken away

2

twice before April 25. (Ex. 3, at 163). In his Response, however, Plaintiff alleges that his network privileges were revoked on only two occasions total: on February 26, 2008 and on April 25, 2008. (Paper 18, at 6).

On April 25, 2008, Plaintiff "attempted to insert a line card into a core switch at Forrestal" (a DOE office), and a complete service failure ensued, causing the network to go down during peak business hours. This outage affected close to 4,000 employees, including the Secretary of Energy and executive management that oversee the EES contract. Investigations revealed that Plaintiff's actions caused the outage. (Paper 15, at 4; Paper 18, at 6). EES and DOE representatives subsequently met to discuss the disruption, and as a result of the outage and his prior performance, Plaintiff's network privileges were revoked and he was taken off the network team to be assigned elsewhere within EES. (Paper 15, at 4).

According to Plaintiff, EES "escorted" him out of the building on April 29, 2008. (Paper 2 ¶ 12). After that date, however, Plaintiff did have interactions with EES, and EES staff called Plaintiff to ask for his resume. (Paper 18, Ex. 5 ¶¶ 9-11). Plaintiff continued receiving pay and benefits until he was ultimately fired on May 19, 2008. Plaintiff and Defendant disagree as to the reason for the firing.

Plaintiff filed a complaint in the Circuit Court for Montgomery County, Maryland which was removed to this court on June 19, 2009. (Paper 2). The complaint contains only two counts: one for race discrimination and one for retaliation. Defendant answered the complaint on June 25, 2009 and filed a motion for summary judgment on January 13, 2010. (Papers 7 & 15). Plaintiff responded to the motion on February 3, 2010 (Paper 18) and Defendant replied on March 1, 2010. (Paper 21).

**II. Standard of Review**

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In other words, if there clearly exists factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 127 S.Ct.

4

1769, 1774 (2007); *Emmett,* 532 F.3d at 297. A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id*. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp.*, 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. (citations omitted).

**III. Analysis**

Defendant contends that it is entitled to summary judgment because Plaintiff cannot establish that a genuine issue of material fact exists to support his claims of race discrimination, and because he cannot establish a *prima facie* case of retaliation. Defendant further argues that even if

Plaintiff can establish a *prima facie* case, it can offer an alternative non-discriminatory reason for the termination of Plaintiff, and therefore it should be granted judgment as a matter of law.

Plaintiff argues that he properly alleges claims of race discrimination and retaliation. He makes claims of disparate treatment based on three theories: unequal pay, disparate discipline and termination. Finally, he argues that he was retaliated against illegally when he was terminated.[1]

**A.   Race Discrimination Claim (Disparate Treatment)**

Plaintiff alleges three theories of disparate treatment: disparate discipline, unequal pay, and termination. Where, as here, a plaintiff has no direct evidence of discrimination, the court must apply the three-step procedure outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, Plaintiff must demonstrate a *prima facie* case. Plaintiff's burden in establishing a *prima facie* case is "not onerous." Rather, he is required only to prove each element by a preponderance of the evidence. *See Texas Dep't of Community Affairs v. Burdine*, 450

---

[1] Before a plaintiff may file suit under Title VII, he is required to file a charge of discrimination with the EEOC. *See Jones v. Calvert Group, Ltd.*, 551 F.3d 297 (4th Cir. 2009); and 42 U.S.C. § 2000e-5(b). Plaintiff has met this requirement, as indicated in his Complaint, in which he states that he received his Notice of Right to Sue on or about March 30, 2009. (Paper 2 ¶ 4).

U.S. 248, 253 (1981). If Plaintiff succeeds in making this showing, the burden then shifts to Defendant to offer a non-discriminatory basis for the adverse employment action. *See Matvia v. Bald Head Island*, 259 F.3d 261, 271 (4th Cir. 2001). Plaintiff must then demonstrate that the reason proffered by his employer for the adverse action is pretextual. *Id.; see also Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000)("The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII.").

### 1. Disparate Discipline

Plaintiff alleges racial discrimination under a disparate treatment theory. He argues that his network privileges were revoked on April 25, 2008, which had the effect of "locking [him] out of the system, preventing him from doing any work, thus unreasonably interfering with his work performance." (Paper 18, at 6).[2] Plaintiff argues that other employees in his position who have made errors causing network outages have not had their network privileges removed and have not been reassigned.

---

[2] In his response, Plaintiff also discusses an incident in February 2008 when Defendant revoked his network privileges after he caused an outage. This incident is not mentioned in the complaint, and is therefore not before the court as a separate claim.

7

To establish a *prima facie* case of race discrimination in the context of allegedly disparate discipline, Plaintiff must show:

> (1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees.

*Cook v. CSX Trans. Co.*, 988 F.2d 507, 511 (4th Cir. 1993); *see also Lightner v. City of Wilmington*, 545 F.3d 260, 264-65 (4th Cir. 2008) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985)). Plaintiff must show that his comparators were similarly situated in all respects, and although the other employees at EES need not have engaged in "precisely the same set of work-related offenses occurring over the same period of time under the same set of circumstances," *Cook*, 988 F.2d at 511, the similarity between the "seriousness of their respective offenses must be clearly established." *Lightner*, 545 F.3d at 265.

Plaintiff is a member of a protected class (he is African-American), and he cites examples of Caucasian and Asian employees outside that class who he claims were disciplined less severely than he was for similar conduct. Rather than actual "conduct" per se, Plaintiff discusses (and includes emails that

8

discuss) incidents when actions by various staff have resulted in network outages or disruptions.  He compares the reactions by supervisors to network outages he caused on February 26, 2008 and April 25, 2008 to the reaction by managers to other employees who have caused outages and disruptions.

After his actions caused the network to go down on each occasion, Plaintiff's network privileges were revoked.[3]  The first time was because Plaintiff "continued to incorrectly update and break switch configuration" and the second time was no doubt due to the severity of the April 25 crash and his failure to forewarn supervisors that he was doing work, as well as the ensuing meeting with top DOE officials.  Patrick Robert ("Robert") disciplined him both times.

Plaintiff attaches several emails showing instances of when other network engineers caused some sort of network disruption and, rather than losing their network privileges, were corrected or reprimanded in an email.  For instance, he attaches an email in which Robert tells two other employees who are on the network team (Andrey Stetsyuk and Brian Adamski ("Adamski")) to stop

---

[3] Although Defendant argues that Plaintiff has not identified any adverse employment action, Plaintiff's identification of the revocation of his network privileges can be regarded as disciplinary action.  Defendant does not offer any information on what type of disciplinary action is imposed under which circumstances - information that might be contained in an employee handbook.

9

doing what they are doing after causing problems. (Paper 18, Ex. 8). He also attaches an email from Patrick Robert to engineer Vy Pham instructing the employee to see him if he is not clear on what is expected, and never to guess if he doesn't know the answer. (*Id.*). Plaintiff attaches an email from Robert to Adamski in which he notes that he has fixed a problem created by Adamski. (*Id.*).

Although the emails show that in those circumstances these engineers did not have their network privileges revoked, the second element of the inquiry remains: was the conduct of these engineers similar to that of Plaintiff's conduct on February 26 and April 25?

Defendant maintains that the "prohibited conduct" of the other employees offered by Plaintiff is not comparable to the behavior by Plaintiff on April 25 or the consequences of that behavior. First, Plaintiff did not notify his team that he was doing work on the system and so no other team members were prepared for the outage. Second, the outage itself was much larger than any of the outages or problems caused by any of the 14 other employees he mentions. (Paper 21, FN 3). Defendant explains that of the 14 incidents Plaintiff cites, ten had no effect on the end user (no outage), one affected three users, one affected twelve users, one was a result of equipment failure, not human error, and one was a result of activity by a

10

non-EES employee. (*Id.*; Ex. 1 ¶ 8). In other words, Plaintiff's action on April 25 incurred much more damage (it affected 4000 users) than any of the incidents Plaintiff references as comparators. With regard to the April 25 outage and Plaintiff's actions that day, the second element of the necessary *prima facie* showing is not satisfied.

## 2. Unequal Pay

To establish a *prima facie* case under Title VII, Plaintiff must show that (1) he is a member of a protected class; (2) he was paid less than an employee outside the class; (3) and the higher paid employee was performing a substantially similar job. *Kess v. Municipal Employees Credit Union of Baltimore*, 319 F.Supp.2d 637, 644 (D. Md.2004).

As noted above, Plaintiff is a member of a protected class. At EES he held a "Tier 2 Support position," and only two Caucasian EES employees also held this position. These employees were both paid a higher salary. Adamski earned $74,623 per year and James Lertora ("Lertora") earned $66,000 per year. Plaintiff earned $65,000 per year. Because Plaintiff was paid less than an employee outside his class for performing a substantially similar job, he has stated a *prima facie* case. Defendant, however, successfully rebuts the *prima facie* case and Plaintiff offers no evidence that Defendant's explanation is pretextual.

Defendant maintains that the comparators had significantly longer length of service with EES or in IT generally, and had greater educational qualifications. Adamski had ten years of IT experience, six of which were spent as a network administrator, prior to joining EES' network engineering team. Lertora also had ten years of IT experience prior to joining EES. They also both possessed a CISCO certification which is "recognized throughout the IT industry as a certification relevant to the type of work performed by the network team." (Paper 21, at 4). Plaintiff had no prior experience working on a network the size and complexity of that at DOE headquarters and did not hold a CISCO certification.

The uncontroverted evidence demonstrates that the comparators, while having similar duties and responsibilities to Plaintiff, had more experience than he did. Plaintiff has not shown that Defendant's reasons for the salary differences are pretextual.

### 3. Termination

Plaintiff's final disparate treatment claim regards his discharge. A *prima facie* case of discriminatory discharge requires a showing that:

> (1) [he] is a member of a protected class;
> (2) [he] suffered adverse employment action;
> (3) [he] was performing her job duties at a
>     level that met [his] employer's legitimate
>     expectations at the time of the adverse

12

> employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004). It is undisputed that Plaintiff is African-American, thus the first element is satisfied. It is also undisputed that he was fired, in satisfaction of the second element. Neither element three nor four is satisfied by Plaintiff's evidence, however. He does not plead facts to show whether the position remained open or was filled by a similarly qualified applicant outside his protected class. Because of his apparent lack of cooperation in revising his resume, and the actions that led to the outage on April 25, he has also not established that he was meeting the expectations of EES. Therefore, Plaintiff has not made out a *prima facie* case for discriminatory discharge. (Even if he could meet it, Defendant offers a non-discriminatory reason for the termination, as explained in the section below.)

**B. Retaliation Claim**

Title VII prohibits an employer from retaliating against an employee who exercises his Title VII rights. *See* 42 U.S.C. § 2000e-3. Plaintiff maintains that he sent an email "opposing a discriminatory practice" and although he was then promoted to the position of network engineer, he was subjected to scrutiny

13

and unfair terms and conditions, which led to his eventual termination. (Paper 2 ¶ 30).

To establish a claim of retaliation, Plaintiff must show that: (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Davis v. Dimensions Health Corp.*, 639 F.Supp.2d 610, 616 (D.Md. 2009); *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). "Plaintiff's burden to establish a *prima facie* case is 'not onerous' and only requires that a plaintiff prove each element by a preponderance of the evidence." *Davis,* 639 F.Supp.2d at 617(citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If Plaintiff can make such a showing, the burden then shifts to the employer to offer a non-discriminatory basis for the adverse employment action. *Matvia v. Bald Head Island*, 259 F.3d 261, 271 (4th Cir. 2001). "The employee then has the opportunity to prove that the asserted reason is pretextual." *Davis,* 639 F.Supp.2d at 617(citing *Matvia*, 259 F.3d at 271)(S*ee also Smith*, 202 F.3d at 248 ("The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII.")).

It is undisputed that Plaintiff suffered an adverse employment action and therefore satisfies the second requirement

of the *prima facie* case: he was discharged.[4] *See Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 775 (4th Cir. 1997) (noting that termination is an adverse employment action). To survive summary judgment, therefore, Plaintiff must show that he was engaged in a protected activity and that there was a causal link between that activity and her termination.

To establish that he engaged in a protected activity, Plaintiff must show that the activity was either "opposition" or "participation." *Davis,* 639 F.Supp.2d at 617. In other words, the protected activity must either oppose a practice prohibited under Title VII (pursuant to the opposition clause); or make a charge, testify, assist, or participate in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause). *Rachel-Smith v. FTDATA, Inc.*, 247 F.Supp.2d 734, 747 (D.Md. 2003). "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."

---

[4] At various points throughout his response, affidavit and in his complaint, Plaintiff's version of events appears to waver. He claims that he was fired twice – once on April 29 and once on May 19. But elsewhere he says he was escorted out of the building on April 29, but not fired. He recounts discussions or interactions he had with EES staff after April 29th as well. He also makes different claims regarding a potential protected activity. The court interprets his claim of retaliation to be arguing that he was ultimately fired – on May 19 – in response to the letter he sent on April 29.

15

*Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

In his response, Plaintiff claims to have sent a memo to several EES supervisors on April 29, 2008 at 3:41 p.m. "opposing disparate discipline." He notes that the memo included a paragraph that read: "With a fair guideline we might have been able to lessen the segregated approach to network engineering conflicts and mishaps." Plaintiff's letter focused on Defendant's policy (or lack thereof) for revoking network privileges, as well as Plaintiff's response to the events on April 25, 2008. It can be construed to fit the definition of "opposition activity" because it is voicing Plaintiff's opinion to bring attention to what he feels is discriminatory activity.

To find a causal connection, "the employer must have taken the adverse employment action because the plaintiff engaged in a protected activity." *Dowe v. Total Action against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). Therefore, Plaintiff's firing must have occurred because of his April 29, 2008 email. Because of the proximity of time between the email and the termination, a causal connection can be inferred.

Although Plaintiff can state a *prima facie* case of retaliation, Defendant has offered sufficient evidence of legitimate, non-discriminatory and non-retaliatory reasons for the firing. Furthermore, Plaintiff's evidence is contradictory

16

at best.  Defendant acknowledges that after the April 25 incident involving Plaintiff, it decided to reassign him. According to the affidavit of Diane Jeffers, the Director of Human Resources at EES, as of April 25 there were 40 open positions at EES and EES decided to reassign him to one of those positions.  (Paper 15, Attach. 4 ¶ 8).  She notes that had Plaintiff accepted a reassignment his salary would have remained the same.  (*Id*. at ¶ 9).  She notes that Plaintiff did not cooperate in the process of finding a different assignment, and so EES terminated his employment on May 19, 2008.  (*Id*. at ¶ 10).  In his deposition, Plaintiff says "that's correct" when asked if it is true that he had "determined in [his] own mind that [he] would not accept any position other than being on the network team, [and he] made a conscious decision not to cooperate with EES in terms of trying to find [him] a different position."  (Paper 15, Attach. 5, at 367).

In his response, Plaintiff paints a different picture of the situation by asserting that Defendant was willing only to demote him.  Pointedly, he admits that pay was never discussed so he has no basis for belief that he would have been taken a pay cut as a result of his reassignment.  In his affidavit he also offers a jumbled picture of what occurred.  He insists that he gave EES two copies of his resume, although he concedes that he would not tailor his resume to fit a help desk position as

17

EES asked him to do.  He includes two direct quotations from EES employees stating that they have not received his updated resume, however, supporting Defendant's contention that it never received a resume from him.  (Paper 18, Ex.5 ¶¶ 9, 10).

Plaintiff's affidavit stating that he did submit his resume to Defendant directly contradicts his deposition testimony that he did not cooperate – and had no intention of cooperating – with Defendant.  The United States Court of Appeals for the Fourth Circuit has previously acknowledged that

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.

*Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990)(quoting *Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir. 1984)).  In this situation, the court's previous statement that "[a] party cannot generate a genuine issue of material fact for summary judgment purposes by making statements in an affidavit that directly contradict his sworn deposition testimony given in the case" is apropos.  *Waterhouse v. R.J. Reynolds, Tobacco Co.*, 368 F.Supp.2d 432, 438 (D.Md. 2005).  Plaintiff is attempting to create an issue of material fact by claiming that he cooperated

with EES after April 25.  His affidavit is not enough to overcome his previous deposition testimony and the affidavit of the Human Resources director, however.  It is clear that Defendant has offered a reason for terminating Plaintiff: it had decided to reassign him after a large error and he was uncooperative in regard to the reassignment.  Plaintiff offers no evidence that this is a pretextual reason, and therefore Defendant has met its burden.

**IV. Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment will be granted on all counts except for the issue of whether Defendant discriminated against Plaintiff when it revoked his network privileges after the February 2008 network outage.  This single issue will survive the motion for summary judgment.  A separate Order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge
